MORRIS (COMMITTEE OF WEST NEW JERSEY SOCIETY v.). See Case No. 3,065.

---

## Case No. 9,829.

### MORRIS v. CORNELL.

[1 Spr. 62;[1] 6 Law Rep. 304.]

District Court, D. Massachusetts. Oct., 1843.

SEAMEN—MATE DISPLACED—ORDERED TO OTHER DUTY—REMOVAL TO FORECASTLE—RIGHT OF COMPLAINT TO CONSUL.

1. A second mate rightfully displaced from heading a boat in the whale fishery, is bound to perform other duty, and upon his refusal to do so, may be punished for disobedience.

2. The right given to seamen by statute of 1840 [5 Stat. 394], to lay their complaints before the American consul, in foreign ports, is one of great importance, which a court·of admiralty will carefully guard.

3. A second mate, who contumaciously refuses to perform duty, may be removed from the cabin to the forecastle.

4. The second mate's being commanded by the master to desist from swearing, and retorting on the master, that he heard him swear, and stating the language, is no justification for the master's violently assaulting and inflicting a blow upon the second mate.

[See Backstack v. Banks, Case No. 711.]

The libellant, who was second mate of the brig Agate, on a whaling voyage, of which the respondent was master, alleged, that the respondent removed him from his office, confined him to his state-room for a long time, deprived him of proper and sufficient food, refused to permit him, at various times, to go on shore at different places, and communicate with the American consul—turned him into the forecastle, where his berth was unsuitable, and committed violent assaults upon his person. The answer denied some of these charges, and justified others. The facts in the case sufficiently appear in the opinion of the court.

E. Bassett, for libellant.

---

[2] [From 14 N. B. R. 371.]
[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

T. D. Elliot, for respondent.

SPRAGUE, District Judge. The most important inquiry in this case, relates to the removal of the libellant from office, or his refusal to do duty, which was the first difficulty, and probably the source of all the others. A material part of the duty of second mate is to head, that is command, one of the boats in taking whales. The master admits that he removed him from this part of his duty, and justifies it on the ground of incompetency.

The libellant insists that it was from malice, and without justifiable cause.

It appears that, after being out about six months, the captain on one occasion headed one of the boats, of which the libellant then acted as boat-steerer, and as such, it was his duty first to strike the whale, when the boat had been placed by the captain in a proper position for that purpose. After an unsuccessful attempt to capture a whale, they returned to the brig. The mate, in presence of the libellant, asked the captain the cause of the failure. The captain said in reply, that it was as good a chance as he wanted, to fasten to a whale's head. The libellant said he did not consider it any chance at all. This was repeated two or three times, and the captain then told him if he did not call that a chance, he should not go in the head of the boat again during the voyage. The libellant replied: "If I don't, I will not do any other duty." The captain then told him he would confine him to his state-room, and keep·him on bread and water, till he did do his duty. The libellant replied: "Very well, do so." The captain then directed the mate to prepare a state-room, by clearing out certain articles, which being done, he ordered the libellant to go into it, and he did so.

It is urged, that this decision of the captain proceeded from passion, and not from any honest judgment as to the libellant's competency. It was certainly a very unfortunate and suspicious moment, in the midst of a contentious conversation, in which the parties had strongly expressed opposing opinions, for the exercise of so delicate and important a power. The manner and the occasion savor strongly of passion, and deprive the master of those presumptions in favor of the rightful exercise of authority which would arise, if it had been done with calmness and deliberation, and challenges the most jealous scrutiny into the justification alleged. That justification is the incompetency of the libellant, or at least the honest judgment of the master, that he was incompetent, after a fair trial.

Was he competent?

[2] [In May, both boats lowered for sperm whales, the larboard being headed by the mate, and the starboard by the libellant. The larboard boat struck and killed the

---

[2] [From 6 Law Rep. 304.]

whale; the school, from seven to twelve brought to, and the mate testifies that the libelant had as good an opportunity as he had, but did not take any. Clow, who steered the larboard boat, testified that Morris had a chance to take one, if he pulled when he ought, and adds; "I thought the man was crazy, he hallooed so. I did not think he knew much about whaling."

[In June, the boats were lowered again. In sperm whaling, it appears that the boat, in order not to be discovered by the whale, must approach him either head and head, as it is called, that is, directly in front, or go directly after him. In this instance it is testified by the mate, that Morris was approaching head and head, and he thinks that if Morris had continued pulling with his oars, he would have struck the whale; instead of which he stopped pulling, hauled on to the wind with his sail; the fish saw the boat, was frightened and escaped. On his return to the brig, he said that he thought the mate would strike the fish, as he was after him, if he, Morris, hauled out on the wind. The captain asked him why he did not take the whale. The mate thinks that Morris, in reply, gave the captain to understand that he could not be expected to do as well as an experienced hand, or as well as the mate. The captain "found considerable fault with him."

[Weeks, who was the libelant's boat-steerer on this occasion, says, that he thinks they "had a chance to go on to a whale if they had kept on pulling," but were ordered by Morris to stop.

[Clow, who was in the larboard boat, says, that they were in pursuit just behind the whale. Morris came down on the whale's eye quartering; the whale slewed round a little, saw Morris's boat, and went down. Morris hove up when he was a little way from him. If Morris had not pulled so near the whale, he thinks they could have got him.

[In September, Morris struck a large whale, which stove the boat, and threw the men into the water. The other boat picked up the men, but the whale was lost. The mate says he thought Morris had a good opportunity to take the whale, but did not approach him properly. Weeks, who was Morris's boat-steerer, says, that they fastened to the whale, he stove the boat, and they cut clear; that the boat was too near the whale; it was Morris's fault, because he did not lay the boat off enough; that when the witness stood up to throw the iron, the flukes of the whale were under the boat.

[These are the only instances in which Morris headed the boat in pursuit of whales. There is evidence, that in attempting to take blackfish, he in one instance had his boat capsized, and in another cut the line after fastening to a fish, owing to some mismanagement or error on the part of Morris or his boat-steerer. During the time he headed the boat he took two blackfish, but not any

whale. The mate took one whale which made about twenty barrels of oil, and several blackfish—how many does not appear. On two other occasions, the captain headed the boat, and Morris acted as boat-steerer. On the first the captain placed the boat in a good position to strike the whale, but Morris did not succeed in doing so. He afterwards admitted that he had a good chance, but made a "muss" of it, as he expressed it to the mate. The other was the time which has already been adverted to, and which ended in the master's displacing him from the head of the boat.

[These facts would seem to raise a pretty strong presumption of want of skill, and to require of Morris the production of evidence to control them by showing his experience and ability. But as whale fishing is a business of a very peculiar character, in which failures often occur, the court would be very reluctant to decide such a question without aid from the judgment of those whose experience or means of observation at the time entitle their opinions to respect. Now, in this case, we have the testimony of the mate and two boat-steerers, who were all the officers excepting the libelant and respondent, and also of five seamen and the steward. The mate thinks that Morris had not had sufficient experience in sperm whaling, and both the boat-steerers express opinions one strongly and the other faintly unfavorable to his competency. Two of the seamen express the same judgment. The others, whose testimony was produced, were not questioned on that point. But we have it in evidence from the mate and others, that the opinion was general among the crew that Morris was not competent to head a boat, and that some of his men were afraid to go with him. No one who was on board the vessel has given a different opinion. The only evidence produced by Morris to show his competency, is the deposition of Captain Shackley, who had previous to this voyage given him a certificate that he was qualified to head a boat. He testifies that he shipped Morris in New Zealand, as third mate and boat-steerer, on board the whale ship Two Brothers, commanded by himself: that he was on board six months, and did his duty as well as any one could, and he thinks him qualified to head a boat. But it is to be remarked, that Captain Shackley never saw him head a boat, or had any knowledge of his doing so. He performed only the duty of a boat-steerer, and as such struck three sperm whales. The libelant was apprized by the answer of the respondent, that his competency was to be put in issue, and has had full opportunity to show his previous experience. He declared to some of the crew that he had never been sperm whaling before, although he had struck sperm whales, which accords with Captain Shackley's testimony, as the Two Brothers was engaged in right whaling. I am constrained, therefore, to believe that the

only experience Morris had had in sperm whaling, was on board the Two Brothers.] [2]

By the shipping articles it was expressly agreed, that if any officer, after a fair trial of his ability, should be judged by the master to be incompetent, he might be displaced. It is unnecessary to inquire whether this varies the authority conferred by law, that is, whether it makes the judgment of the master, after a fair trial, conclusive, because, upon the evidence, the respondent had, I think, sufficient grounds for judging the libellant to be incompetent to head a boat, and that he is entitled to the benefit of that justification, notwithstanding the unfortunate time and manner in which that judgment was declared.

[Captain Gifford, an experienced master in the whale fishery, testifies that a competent master can very soon determine whether an officer has the requisite skill; that seeing him once attempt to catch a whale is sufficient, and that the opportunity afforded to Morris constitutes a fair trial. He further states, that from the facts testified to, he should think that Morris had not the requisite skill. No one has expressed a different opinion upon either of these points. The respondent had, I think, sufficient grounds for judging the libelant incompetent to head a boat, and that he is entitled to the benefit of that justification, notwithstanding the unfortunate time and manner in which that judgment was declared. It was not the first time he had expressed his dissatisfaction; and Morris's persisting in asserting that to be no chance to strike a whale, which the master himself saw and declared to be a good one, might go far to strengthen a conviction that he was not qualified to judge whether a boat was placed in proper position or not. The master had the inducement of personal convenience to retain Morris in the head of the boat, for by displacing him, he thereafter imposed that duty upon himself.] [2]

It is insisted that Morris was not bound to perform any other duty, even if rightly displaced; that he was thenceforth a "quasi passenger." To this doctrine I cannot accede. The services of every man on board are needed. Take the case of our merchant ships, to which the same law applies. The second mate is disrated for incapacity, and a foremast hand placed in his stead. Shall he by his own misrepresentations as to his qualifications, deprive the ship of the services of an important officer, and by making her shorthanded, increase the hazard and add to the labors of all others, while he eats the bread of idleness, and is only an incumbrance to the ship?

I have no doubt that Morris, when he shipped, thought he should be able to perform the duties of second mate. I acquit him of all designed deception. Still, it was

obligatory on him to know his qualifications, and if in fact, found to be unfit for a portion of his duties, he was still bound to have performed others. In refusing all duty, therefore, he was wrong, and set an example of insubordination and disobedience, which the master had a right to punish. He had a right to coerce him to submission.

Was the punishment excessive? It was not sufficient to produce submission. Morris never performed or expressed a willingness to perform other duty. It is said he was confined to his state-room. It is true, he was not permitted to pass through the cabin, but there was a scuttle, through which he could, at any and all times go on deck, with little, if any, difficulty. The mate testifies, that on a former occasion, he occupied the same state-room, in the same manner for two months, on account of a sick man being in the cabin, and that he found no difficulty in passing through the scuttle. Morris was not allowed to go forward of the try-works. With this exception, his movements on deck were unrestricted. He was kept on bread and water for a week or a fortnight, and afterwards, without any submission or request on his part, he was allowed meat and a kind of pudding called "duff," as often as the officers in the cabin. Complaint is also made of the want of light in his state-room, on which point there is some conflict of testimony. His health did not suffer, and considered as a punishment for refusal of duty and continued resistance of authority, his confinement and privations were not excessive.

The next allegation against the respondent is, that he prevented the libellant at different ports, from laying his complaints before the American consul. This right is secured to every seaman by the statute of 1840 [Langtree's Ed.] c. 23 [5 Stat. 394, c. 48], and if the consul be an upright and independent officer, it may be of immeasurable value to the oppressed and friendless mariner in distant regions. It may be called the habeas corpus of the seaman, and the court will carefully and vigorously guard its inviolability. But in the present instance, there is not the slightest evidence that any request was made, or desire expressed, by the libellant to the respondent, to go on shore to see the consul, or to lay any complaint before him. The libellant not being in close confinement, had free intercourse, at his pleasure, with the mate and seamen. He could easily have communicated with the consul through them; and it appears that in one instance, he did without the captain's knowledge, write to the consul. The contents of that letter are not stated. But its existence, at least, was made known to the captain while on shore, and it is inferred that he made representations to the consul, which prevented his noticing it. That inference may be true, but there is no evidence that such was the fact.

Another ground of complaint is, that the libellant was not allowed to go on shore, at any of the various ports visited by the brig after he was displaced. The first port which she afterwards entered, was the Isle of Sol. The respondent there granted him leave to go ashore, but discovering that he had put his clothes into the boat, the respondent ordered them to be taken out, and kept on board the brig, and thereupon the libellant refused to go. He had previously declared his intention to escape, and such was evidently his purpose. Once after this, at another port, he asked permission through the mate, to go ashore, and was refused. No reason for the request was assigned.

Considering that he was in a state of continued contumacy, and had manifested an intention to leave the vessel, I do not think he was entitled to the indulgence of going ashore for his gratification. As to his removal to the forecastle, it was a rightful exercise of authority by the master, after his refusal to do duty, and I do not think it shown that his berth there was such as to render it wrongful.

There remain to be considered, the two assaults upon the libellant. While Morris lived in his state-room, and was ordered not to go forward of the try-works, he, on one occasion, went to the galley to light his pipe. The captain ordered him aft, and laid hold of him. One witness testifies that he seized him by the throat, and pressed him over the lashing that went over the galley, then let go, and Morris went to the after part of the try-works, and sat on a barrel; that after some words between them, which are not stated, the captain seized Morris again by the throat, pressed him against the try-works, and Morris was red in the face. The other three witnesses who speak to this assault, did not see the captain take him by the throat, but say that he collared him, and pushed him along. On a subsequent occasion, Morris in an angry conversation with Clow, was using profane language; the captain told him not to swear; he replied that he had heard him (the captain) swear; the latter asked him what? He answered he had heard him "damn the men's eyes!" The captain then in a rage seized him violently—in what manner in the first instance, is left doubtful; but there is no doubt, that before leaving him, he had him by the hair, a little of which was torn out, and inflicted a blow which left a mark on the eye. Morris acted only on the defensive.

These assaults are without justification, and the only question is the amount of damages. The conduct of the captain toward his crew seems to have been in other respects unexceptionable; and the mate, who has manifested no leaning toward Morris, testifies to the latter's "good disposition." These outbreaks may be attributed, in a great degree, to the continued irritation in which the parties were kept, by the unfortunate relation in which they stood to each other. Of this, Morris was the blameworthy cause. In passing forward of the try-works to the galley, he transcended the limits assigned to him, and was in fault. When properly checked for swearing, he was wrong in retorting upon the captain—but the provocation was not great. There was no exigency —no emergency. The captain was bound to suppress his passion. If unable to control himself, he is unfit to command others. He is to set an example of calmness and self-possession. Violence begets violence. Hasty words and rash acts on shipboard, often produce deplorable consequences, which a little forbearance would have prevented.

The bodily injury to the libellant was not very great, but he was subject to the indignity of unjustifiable violence to his person, and his feelings are not to be disregarded.

I shall decree $50 damages and costs.

That an officer, when disrated, is bound to perform other duty, and what duty, see The Mentor [Case No. 9,427]; Smith v. Jordan [Id. 13,068].